**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **J.L. et al,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Case No. 4:09CV457MLM** |
| ) | |
| **FRANCIS HOWELL R-3 SCHOOL** ) | |
| **DISTRICT,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

Before the court is the Motion for Summary Judgment filed by Plaintiffs J.L., by and through his next friends Deborah LaFond and Barry LaFond, and Deborah LaFond and Barry LaFond, individually (jointly, "Plaintiffs"). Doc. 21. Also before the court is the Motion for Judgment on the Record as to Counts I and II, Motion for Judgment on the Pleadings, or, in the alternative, for Summary Judgment as to Counts III and IV filed by Defendant Francis Howell R-3 School District (the "District"). Doc. 41. The parties have filed Responses and Replies to the respective pending motions.[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 7.

---

[1] The District filed a Response to Plaintiffs' Motion for Summary Judgment and an Amended Response. Docs. 27, 40. Plaintiffs filed a Reply. Doc. 29. Plaintiffs filed a Response to the District's Motion. Doc. 45. The District filed a Reply to Plaintiffs' Response. Doc. 49.

# I.
## STANDARD FOR MOTION FOR SUMMARY JUDGMENT [2]

The court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota, Minn. & E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248.

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in its favor.

---

[2] One issue before the court is the applicable standard of review.

Id. at 255; Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Id. at 252. With these principles in mind, the court turns to an analysis of the pending motions.

## II.
## INDIVIDUALS WITH DISABILITIES EDUCATION ACT- COUNTS I AND I I

**A.    Legal Framework of the Individuals with Disabilities Education Act ("IDEA"):** [3]

As a preliminary matter, this court has jurisdiction as this matter arises under the IDEA, 20 U.S.C. §§ 1400-1487 (Supp. IV 1998), and, in particular, IDEA, § 1415(I)(3).

The IDEA is designed "to insure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." IDEA, § 1400(d)(1)(A); Honig v Doe, 484 U.S. 305, 308 (1988). "To accomplish this end, the IDEA provides federal money to state and local educational agencies that undertake to implement the substantive and procedural requirements of the IDEA." Sch. Comm. of Town of Burlington v. Dept. of Ed. of Massachusetts, 471 U.S. 359, 368 (1985).        Section 1412 provides that for a state to be eligible for assistance under the IDEA, it must demonstrate that it "has in effect policies and procedures to ensure that it meets [specified] criteria." In particular, to be eligible for IDEA assistance a state must, among other things, have policies and procedures which: (1) provide a free appropriate public education ("FAPE") for all children with disabilities (§

---

[3]        The court has initially set forth the legal framework of the IDEA because the factual history of this matter can better be understood in the context of procedures mandated by the IDEA. In Count I Plaintiffs allege a cause of action pursuant to the IDEA. Plaintiffs incorporate Count I, by reference, in Counts II, III, and IV. Plaintiffs also allege claims in Counts III and IV based on § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq., and on Title II of the Americans with Disabilities Act of 1990.

1412(a)(1)(B)); (2) identify children in need of special education, known as Child Find (§ 1412(a)(3));

(3) establish an individualized education plan ("IEP"), which is developed, reviewed, and revised for

each child with a disability (§ 1412(a)(4)); (4) provide procedural safeguards for children with

disabilities and their parents (§ 1412(a)(6)); and (5) evaluate children with disabilities (§ 1412(a)(7)).

A FAPE means that special education and related services have been provided, that they

conform to applicable state standards, that they include an appropriate school, and that they are

provided in conformity with the IEP required by § 1414(d).  See 20 U.S.C. § 1401 (a)(8)(A)-(D).

The Eighth Circuit has stated the following in regard to whether a child has received a FAPE:

> A child receives a free appropriate public education if he receives "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Rowley, 458 U.S. at 203, 102 S.Ct. 3034. The IDEA requires that public school districts offer eligible children "instruction and supportive services reasonably calculated to provide *some educational benefit*." Springfield, 358 F.3d at 999 n. 7. The statute also requires that students with disabilities be educated in the "least restrictive environment," 20 U.S.C. § 1412(a)(5)(A), reflecting a "strong preference" that disabled children attend regular classes with non-disabled children and a presumption in favor of placement in the public schools. Independent Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 561 (8th Cir. 1996). "[C]hildren who can be mainstreamed should be mainstreamed, if not for the entire day, then for part of the day; similarly, children should be provided with an education close to their home, and residential placements should be resorted to only if these attempts fail or are plainly untenable." Evans v. Dist. No. 17, 841 F.2d 824, 832 (8th Cir. 1988).

T.F. v. Special Sch. Dist. of St. Louis County, 449 F.3d 816, 820 (8th Cir. 2006) (emphasis

added).

IDEA, § 1414 addresses evaluation procedures and specifically requires reevaluation "if

conditions warrant . . . [or] if the child's parent or teacher requests a reevaluation, but at the very

least once every three years." IDEA, § 1414(a)(2).  A team of professionals must develop an IEP "for

each disabled student, taking into account that child's capabilities." Neosho R-IV Sch. Dist. v. Clark,

315 F.3d 1022, 1026 (8th Cir. 2003).  An IEP means "a written statement for each child with a

disability that is developed, reviewed, and revised in accordance with section 1414(d)." 20 U.S.C. § 1401(a)(11). An IEP is required to set forth "the child's present educational performance, establish [] annual and short-term objectives for improvements in that performance, and describe[] the specially designed instruction and services that will enable the child to meet those objectives." Honig, 484 U.S. at 311.

"[A] school district must convene a team to formulate an IEP in light of the child's abilities and parental views about the child's education." Gill v. Columbia 93 Sch. Dist., 217 F.3d 1027, 1034 (8th Cir. 2000) (citing 34 C.F.R. §§ 300.343(b)(2), 300.346(a)(1)). "The parents, the child's teacher, and a school official knowledgeable about special education must be included on the team which devises and reviews the IEP, and parents are free to invite other individuals with expertise to participate." Id. (citing Sch. Comm. of the Town of Burlington v. Dept. of Educ. of Mass., 471 U.S. 359, 368 (1985); Doe by Gonzales v. Maher, 793 F.2d 1470, 1489 (9th Cir. 1986)). "Parental consent must be obtained prior to the 'initial placement of a handicapped child in a program providing special education and related services, 34 C.F.R. § 300.504(b)(1) (1985), unless the educational agency obtains an override through the applicable administrative procedures." Id. at 1489 n. 12. However, "[t]he Act nowhere explicitly vests [a child's parents] with a veto power over any proposal or determination advanced by the educational agency regarding a change in placement." Id. at 1489. An IEP must be reviewed at least once a year and be periodically revised in response to information provided by the parents and to ongoing evaluations of the child's progress." Gill, 217 F.3d at 1034. Whether an IEP is "reasonably calculated to provide some educational benefit is a mixed question of law and fact." Id. at 1035 (citing § 300.343(c)(2)).

IDEA, § 1414(d) further requires that each IEP must include: a statement of the child's present levels of educational performance, including how the child's disability affects the child's involvement

and progress; a statement of annual goals, including short-term instructional objectives; a statement of the specific educational services and supplementary aids to be provided to the child and the extent to which the child will be able to participate in regular educational programs; a explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and activities; a statement of any individual modifications in the administration of assessments of the child's achievement; and the projected dates for initiation and duration of services. See IDEA, 20 U.S.C. § 1414(d)(1)(i),(ii),(iii),(iv),(v). Section 1414(d)(2)(A) further provides that an IEP must be in effect at the beginning of the school year for each child with a disability. Section 1414(d)(3)(A) provides that the IEP team also must consider the results of a child's initial or most recent evaluation. In the case of a child whose behavior impedes his or her learning, the IEP team must consider appropriate strategies to address that behavior. See 1414(d)(3)(B). Finally, an IEP team, "periodically, but not less than annually must determine whether the annual goals for the child are being achieved." See 1414(d)(4)(A)(i).

The IDEA does not require that a school either maximize a student's potential or provide the best possible education at public expense. Fort Zumwalt Sch. Dist. v. Clynes, 119 F. 3d 607, 612 (8th Cir. 1997). The Act requires only that a student receive sufficient specialized services to benefit from his education. Id. See also Rowley, 458 U.S. at 195 (IDEA's goal is "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."). See also Doe v. Bd. of Educ., 9 F.3d 455, 459-60 (6th Cir. 1993) (holding that the IDEA requires a school district to provide "the educational equivalent of a serviceable Chevrolet ... not ... a Cadillac").

In regard to placement of a disabled child in a private school, 34 C.F.R. § 104.33(c)(4) provides:

> Placement of handicapped persons by parents. If a recipient has made available, in conformance with the requirements of this section and § 104.34, a free appropriate public education to a handicapped person and the person's parents or guardian choose to place the person in a private school, the recipient is not required to pay for the person's education in the private school. Disagreements between a parent or guardian and a recipient regarding whether the recipient has made a free appropriate public education available or otherwise regarding the question of financial responsibility are subject to the due process procedures of § 104.36.

See also T.F., 449 F.3d at 820 ("The IDEA as amended in 1997 'does not require a local educational agency to pay for the cost of education ... at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.'") (quoting Jasa v. Millard Pub. Sch. Dist. No. 17, 206 F.3d 813, 815 (8th Cir. 2000)).

Thus, "parents who unilaterally 'enroll their child in private school without the approval of the public school district do so with the risk they will not receive reimbursement for their costs.'" Id. (quoting Fort Zumwalt, 119 F.3d at 611-12).

On the other hand, IDEA, § 1412(a)(10) (C), provides that when parents of a child with a disability enroll the child in a private school, under circumstances where an agency has not made a FAPE available to the child in a timely manner, a court or hearing officer may require the agency to reimburse the parents for the cost of enrollment in a private school. Section 1412(a)(10)(C)(iii)(I)(aa) requires that in order to receive tuition reimbursement, parents should inform the IEP team that they were rejecting the placement proposed by the public agency. Section 1412(a)(10)(C)(iii)(I)(bb) further requires that parents give 10 days written notice prior to the removal of a child from a public school. In regard to a parent's right to tuition reimbursement for placing a child in private school, the Eighth Circuit holds that a parent does so at his or her own risk. Gill, 217 F.3d at 1035 (citing Burlington, 471 U.S. at 373-74). However, parents are entitled to tuition reimbursement if "public school placement violated IDEA and placement [in the private school] was proper under the Act." Id.

IDEA, § 1415, sets forth, with particularity, procedural safeguards. Section 1415(f) requires that when a parent files a complaint regarding the identification, evaluation, or educational placement of a child, or the provision of a FAPE to such child, the parent is entitled to a due process hearing conducted by the State or local educational agency. An appeal from the findings of a local agency may be taken to the State agency, pursuant to § 1415(g). Ultimately, IDEA, § 1415(i)(2), provides for the right to bring a civil action in any State court of competent jurisdiction or in the district court of the United States without regard to the amount in controversy. Prior to initiating a federal civil action, an aggrieved party, however, must exhaust all administrative remedies. See IDEA, § 1415(I)(2)(A).

This court's review of an agency decision made pursuant to the IDEA is controlled by Independent School District No. 283 v. S.D. by J.D., 88 F.3d 556, 561 (8th Cir. 1996), in which the Eighth Circuit stated that:

> Judicial review of agency action may be conducted on the administrative record even if there are disputed issues of material fact. Under IDEA, the reviewing court bases its decision on "*the preponderance of the evidence*." That is a less deferential standard of review than the substantial evidence test common to federal administrative law. But still it requires the reviewing court to give "due weight" to agency decision-making.

(emphasis added).

Further, a district court complies with § 1415(e)(2) when, upon reviewing the outcome of State administrative proceedings, it "review[s] the administrative record and, expressly appl[ies] the statutory preponderance standard, credit[s] the hearing officer's findings because the fact finding had an 'opportunity to observe the demeanor of witnesses and [ ] render[s] believability determinations.'" Id. at 561 (citing Doyle v. Arlington County Schl. Bd., 953 F.2d 100, 105-06 (4th Cir. 1991)). See also Yankton Schl. Dist.v. Schramm, 93 F.3d 1369, 1373 (8th Cir. 1996).

A district court should give "due weight" to proceedings before a state hearing panel. T.F., 449 F.3d at 818; Strawn v. Missouri State Bd. of Educ., 210 F.3d 954, 958 (8th Cir. 2000); Neosho, 315 F.3d at 1022. Additionally, a district court, upon conducting judicial review pursuant to the IDEA, may not "substitute [its] own 'notions of sound educational policies for those of the school authorities.'" Id. (citing Petersen v. Hastings Pub. Schs., 31 F.3d 705, 707 (8th Cir. 1994)). See also T.F.,449 F.3d at 818 (quoting Rowley, 458 U.S. at 206-107). Specifically, IDEA, § 1415(I)(2)(B)(i)-(iii), provides that a district court shall consider the administrative record, hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. Ordinarily, a hearing panel's findings of fact are considered to be "prima facie correct." S.D. by J.D., 88 F.3d at 561. "'When both the original hearing officer and the state review officer agree on issues ... even greater deference is due.'" Breen by and Through Breen v. St. Charles R-IV Sch. Dist., 2 F. Supp.2d 1214, 1220 (E.D. Mo. 1997) (quoting Combs v. Sch. Bd. of Rockingham County, 15 F.3d 357 (4th Cir. 1994)).

When an aggrieved party challenges an IEP in court, the court must engage in a two-part inquiry as follows:

> (1) "has the State complied with the procedures set forth in the Act?" and (2) is the IEP "reasonably calculated to enable the child to receive educational benefits?" Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 ... (1982). "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." Id. at 207, 102 S.Ct. 3034.

Neosho, 315 F.3d at 1026-27.

Thus, the State meets its burden upon a court's review of an administrative decision under the IDEA if the State complied with the IDEA's procedural requirements and the IEP developed through the procedures was "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-207. Also, "[i]f state legislation implementing IDEA creates a higher standard than

9

the federal minimum, an individual may bring an action under the federal statute seeking to enforce the state standard." Gill, 217 F.3d at 1035 (citing Fort Zumwalt, 119 F.3d at 611).

Missouri has in effect a state plan for IDEA. The Missouri State Plan ("State Plan"), as well as Mo. Rev. Stat. § 162.961.3, provide for procedures for appointment of a three-member hearing panel to review the results of an IEP pursuant to the request of a parent or the responsible educational agency. Mo. Rev. Stat. § 162.961.3 provides, in relevant part, in regard to a hearing panel's reviewing the results of an IEP:

> [T]he [State Board of Education] or its delegated representative shall within fifteen days after receiving notice, empower a hearing panel of three persons who are not directly connected with the original decision and who are not employees of the board to which the appeal has been made. All of the members shall have some knowledge or training involving children with disabilities, none shall have a personal or professional interest which would conflict with his or her objectivity in the hearing, and all shall meet the department of elementary and secondary education's training and assessment requirements pursuant to state regulations. One person shall be chosen by the local school district board or its delegated representative or the responsible educational agency, and one person shall be chosen at the recommendation of the parent or guardian.

Additionally, in regard to the composition of a hearing panel, it must be comprised of "individuals with expertise or training in education." Gill, 217 F.3d at 1035. Additionally, the State Plan specifies that persons on the list from which parents and school districts select panel members must meet training and assessment requirements. State Plan, Part B, Part II, § VI, N. The decision of a three-member hearing panel must "be by majority vote." Mo. Rev. Stat. § 162.961.5.

## B.    FACTUAL BACKGROUND: [4]

---

[4]    The facts as stated are unrefuted unless otherwise indicated and are as stated in the administrative record, including the Joint Stipulation of Facts into which the parties entered prior to the administrative hearing and the Findings of Fact of the Three-Person Due Process Hearing Panel, which itself references the administrative record. The Stipulation is designated as Defendant's Exhibit, Tab 5. The Decision of the Due Process Panel is designated as Defendant's Exhibit, Tab

The court will first summarize the relevant facts. J.L. was born on July 7, 1991. J.L.'s parents live in the Francis Howell School District (the "District") and J.L. lives with them and a brother who is in the home part-time. J.L. is a student with an educational disability under the IDEA and received special education services through the District, first as a student with an emotional disturbance, starting on September 12, 2003, and since May 2, 2006, as a student with a diagnosis of other health impairment. J.L. attended the District's schools starting in kindergarten at Harvest Ridge Elementary, transferring to Becky Davis Elementary starting in the fourth grade, attending Barnwell Middle School for grades six through eight, and attending Francis Howell North High School for ninth grade during the 2006-2007 school year. J.L. is currently attending the Devereux Glenholme School ("Devereux") in Washington, Connecticut. On December 28, 2007, J.L.'s mother requested reimbursement for the cost of Devereux, future costs, transportation costs, and future transportation costs. Def. Tab. 5-Stipulation of Parties. This request was denied by the District and subsequently by a Three-Person Due Process Hearing Panel ("Due Process Panel" or "Panel"). Def. Tab 6.

During his fifth grade year at Becky David Elementary School J.L. was referred to Student Teacher Assistance Team ("STAT") due to attention problems and poor reading comprehension. The STAT referral noted that J.L. had a medical diagnosis of ADHD and ODD and that he took Depakote, Celexia, Resperdal, and methphenidate (Ritalin). The October 2002 STAT agreed to keep J.L. in regular education and gave him extended time to turn in assignments, a single folder for work to do and work completed, and an assignment book to be checked by his teachers. Pl. Tab 17, R-21 at 80.[5]

In the fall of 2003, J.L. started in the sixth grade at Barnwell Middle School. On August 19,

6.

[5]     Exhibits designated as "R" are included in both Plaintiffs' and Defendant's tabbed exhibits. The court will refer to this exhibits by the designation "R" to be consistent with the decision of the Three-Person Due Process Hearing Panel.

2003, a Request for Initial Special Education Evaluation was completed. Def. Tab. 5. The referral identified parent concerns as reading comprehension, amount of homework each night, and turning in work. The Referral noted that J.L. was seeing a neurologist due to OCD and picking his lips. The Referral continued to state that there was a possible bipolar issue. Notice and consent for the initial evaluation was completed on August 19, 2003. On August 21, 2003, authorization to share information with Garrett Burris, M.D., and Steven Buck, LCSW, were provided. Def. Tab. 5.

Mr. Buck sent a letter dated September 9, 2003, which indicated that he provided family therapy and had worked with J.L. for four or five years addressing ADHD issues, low self-esteem, and socialization skills. Mr. Buck's letter indicated that he typically met with J.L. on a weekly basis to address impulsivity, hyperactivity, short attention span, and difficulty controlling his behavior. Def. Tab. 5.

The District's initial special education evaluation was completed on September 12, 2003. J.L. was twelve years of age and in the sixth grade at Barnwell Middle School at the time of the evaluation. Cognitive assessment using the WISC-IV produced a Verbal Comprehension Index Score of 93, a Perceptual Reasoning Index Score of 119, a Working Memory Index Score of 88, a Processing Speed Index Score of 78, and a Full Scale IQ of 93. Def. Tab. 5. Dr. Martin Russo, who administered the test, reported that "[a] Full Scale IQ of 94 indicates that Student functions intellectually at the 34th percentile relative to his age level peers." R-27 at 102-103. On the Conner's Continuous Rating Scale J.L.'s scores matched an ADHD clinical profile. R-27 at 102-103. On the Wechsler Individual Achievement Test J.L. obtained scores of 102 on Word Reading, 88 on Reading Comprehension, 113 on Pseudo Word Reading, 87 on Numerical Operations, 91 on Math Reasoning, 105 on Spelling, and 104 on Written Expression. On the Behavior Assessment System for Children, Self-report form, J.L.'s ratings presented validity scales which suggested an involved profile. The ratings presented J.L. as

anxious, having low self-esteem, feeling somewhat isolated, being somewhat alienated from his parents, and with no signs of depression or thought disorders. Def. Tab 5; R-27 at 108.

Based on the evaluation J.L. was found to be eligible for special education services by meeting the emotional disturbance criteria. Def. Tab 5. An initial IEP was developed on September 23, 2003, at the time J.L. was starting sixth grade. It listed a diagnosis of ADHD, OCD, and possible ODD. J.L. was given an educational diagnosis of Emotionally Disturbed. Two goals were included in the IEP. Goal I was that J.L. was to "increase his attention to classroom work and behavior by 80% 3/4 times" and Goal II was that J.L. was to "increase his organizational skills by 80% 3/4 times." Also, J.L. was provided with forty-eight minutes of special education services four times per week in "Individualized Instruction in the area of Ed Maint." A Positive Behavioral Support Plan was attached to the IEP. It addressed two behaviors. The first was: "Bringing home proper materials," with an intervention which stated "teaching prompting." The second behavior targeted was "use class time wisely." R-28 at 122. The Educational Management class was held in the special education resource classroom. R-28 at 118.

The next IEP was developed on August 19, 2004. J.L. was entering the seventh grade at that time. Under the heading, "How the child's disability affects his involvement and progress in the general education curriculum," the August 19, 2004 IEP stated:

> Throughout the previous school year [J.L.] did experience some difficulty. He struggled with his time management and organizational skills. When given time in class, [J.L.] would not always use it to complete his assignments. This would then make him sometimes have hours of homework each night, which could then cause problems at home.

R-31 at 131.

The August 19, 2004 IEP further stated that J.L.'s strength's included "his reading" and that when he "completed his work, it was usually done very well." R-31 at 131. It was noted that since

the prior IEP J.L.'s grades "started to slip a little toward the end of the year" and that it was decided to take him out of Spectra, which was a gifted program in which J.L. had been enrolled since the first grade. R-13 at 39-40; R-31 at 131. The present level indicated the diagnosis was emotionally disturbed and that there was a medical diagnosis of bipolar disorder. The goals stated in the IEP were that J.L. would increase his attention to classroom work and behavior by "90% 3/4 times" and that he would increase his organizational skills by "90% -3/4 times." R-31 at 134. Additionally, a Positive Behavior Support Plan was attached to J.L.'s IEP, which contained four targeted behaviors. These behaviors included: bringing home proper materials, using class time wisely, filing out a planner, and turning in proper materials and assignments. The IEP also provided for Educational Maintenance for forty-seven minutes, five times a week and that J.L. was to receive the following supports on an as needed basis: "extended time, copy of notes, preferential seating, modify assignments, small group, copy of book at home." R-31 at 135. According to the Due Process Hearing Panel's decision the August 19, 2004 IEP also states that, in regard to the first goal, J.L. was making sufficient progress during the first two periods, "but not the last one" and that J.L. "made sufficient progress during all three periods."[6] Def. Tab 6, ¶ 37.

The IEP team met again on January 20, 2005, when J.L. was fourteen years of age and in the eighth grade at Barnwell Middle School. R-35 at 148. An IEP issued on January 21, 2005, stating that J.L. had a medical diagnosis of ADHD, OCD, possible ODD, and bipolar. His medications included Seroquel, Lexapro, Tenex, Adderall, and Lamital. The January 2005 IEP further states that J.L. "still [had] some problems in general education classes and [was] working to resolve them"; that J.L. "struggle[d] with time management and organization" and did "not always utilize class time

---

[6] In the court's opinion, the August 19, 2004 IEP is not clear in regard to this statement. See R-31 at 134.

wisely"; that he "sometimes [had] a backlog of work that [was] due" and which could "become overwhelming at times"; that J.L.'s symptoms were "largely controlled by medication"; that he did not "act out in disruptive ways" and "seem[ed] motivated to do well"; that he "seem[ed] to be developing a stronger sense of internal motivation"; that J.L.'s parents were "concerned about the accuracy and quality of the work completed"; that these were "areas" that "need[ed] improvement"; that since the initial or prior IEP J.L. had "taken some responsibility for his work while at school and his teachers report[ed] that he [was] completing tasks and joining in group activities to a greater extent"; that "recently" J.L. had been given the Gates Reading Inventory on which he scored at the fifth grade level; that J.L.'s "reevaluation (9/03) show[ed] a full scale IQ of 98 which is above average"; that J.L. tested "as significant for anxiety and self-esteem"; that in the last SAT 9 testing J.L. scored below average in the Total Battery, Science, Social Studies, Reading, and Math, and average in Language; and that J.L. planned on attending college after high school. Def. Tab 5; R-35 at 148-50. The single goal included in the IEP was that J.L. would "complete class work and participate in classes 90% of the time." Further, the IEP provided that J.L. would receive 47 minutes of special education maintenance five times per week and 141 minutes of specialized instruction in the areas of behavior and academic support five times a week and that these services were to begin on September 13, 2005. The Positive Behavior Support Plan contained in the IEP provided that the targeted behavior included J.L.'s coming prepared for class, getting all assignments and notes, and filling out a planner and turning in assignments. It was noted that J.L. made sufficient progress in regard to goals during four reporting periods. R-35 at 149, 152-53, 159.

During seventh grade J.L. took MAP testing in the areas of Communications Arts and Science and on both tests his achievement level was in the lowest category. Pl. Tab. 6, Ex. BB. He had no accommodations for this test. R-38 at 169.

The next IEP meeting was held on October 26, 2005, when J.L. was fourteen years old and in the eighth grade at Barnwell Middle School. At that time J.L. had medical diagnosis of ADHD, OCD, ODD, and bipolar. Def. Tab 6. J.L.'s goals included increasing his attention to class work, increasing his organization skills, and increasing his basic reading level. The IEP provided that J.L. would continue receiving Educational Maintenance on a daily basis. The Positive Behavior Support Plan targeted increasing work completion, increasing organizational skills, increasing comprehension of test questions and reading assignments. The IEP also included accommodations and supports for J.L. An October 26, 2005 Notice of Action stated that J.L.'s reading comprehension would be addressed. R-38 at 172-4, 182-85.

During J.L.'s eighth grade year, he took MAP tests in the areas of Communications Arts, Mathematics, and Social Studies. In Communications Arts and Mathematics he placed in the "Below Basic" category and in Social Studies he placed in the lowest category on the scale. Pl. Tab 5, Ex. AA.

On November 14, 2005, a Notice of Action was provided addressing the addition of a reading class. R-38 at 187. On November 21, 2005, Greg Mattingly, M.D., wrote that J.L. had a diagnosis of ADD and severe bipolar affective disorder and listed Lexapro, Seroquel, Lamictal, and Zypreza as his medications. Def. Tab. 5. A review of existing data was completed on March 2, 2006, and consent was received to reevaluate in the areas of cognition, speech and language, academics behavior (social/emotional), autism, sensory integration, and fine motor. Def. Tab. 5.

An occupational therapy referral dated March 23, 2006, indicated that J.L. was to be evaluated for possible autism and to rule out sensory motor and fine motor deficits. The referral noted that J.L. had fetishes about what type of material to wear. Def. Tab. 5, ¶ 24. Cognitive assessment using the WISC-IV produced a Verbal Comprehension Index Score of 99, a Perceptual Reasoning Index Score of 88, a Working Memory Index Score of 59, a Processing Speed Index Score of 75, and a Full Scale

IQ of 78. Def. Tab. 5, ¶ 25. The summary from the Sensory Profile noted some concerns and identified the following as factors impeding J.L.'s learning: attention to task, change in routine, and transitioning from one activity to another. The report recommended the modifications at the current IEP should be followed, which were considering preferential seating and a visual schedule. Def. Tab. 5, ¶ 26. The result of this evaluation was that J.L. qualified as a child with an Other Health Impairment based on medical diagnosis of ADD and bipolar disorder. Def. Tab 5, ¶ 27.

A new IEP was developed following the evaluation conference on May 2, 2006. The IEP stated that J.L.'s medications included Seroquel, Lexapro, Tenex, Adderall, Lithium, and Lamital. Def. Tab. 5, ¶ 28. It was determined that J.L. qualified as a child with an Other Health Impairment based on the medical diagnosis of ADD and bipolar disorder. The May 2, 2006 IEP covered the rest of J.L.'s eighth grade year and was in preparation for ninth grade. Goals stated were that J.L. would increase his attention to class work and behavior, increase his organizational skills, increase his basic reading level, increase his reading comprehension skills, and increase his math reasoning skills, and that for the rest of eighth grade J.L. would have Educational Maintenance class five times a week in the Special Education Resource Room and "CWC" classes five times a week in Social Studies, Communication Arts and Math. For ninth grade the May 2, 2006 IEP provided for special education classes in Math and Social Studies and CWC classes in Communication Arts and Science, five times a week. These suggestions for ninth grade were made by J.L.'s tutor, Dr. Shirley Kaczmarski, who attended the IEP. J.L. was to receive accommodations upon his taking certain tests and he was to be provided with home set of textbooks and materials, preferential seating, extended time for completion of tests, test taking in small groups, extended time as needed for completion of assignments, daily maintenance of assignment notebook, daily positive reinforcers, and daily reminders of rules. In addition to Dr. Kaczmarski, attendees at the May 2, 2006 IEP meeting included Julie

Troxell, J.L.'s Case Manager and special education teacher for the eighth grade, and Dan Lamb, who was to be J.L.'s Case Manager for ninth grade, two regular classroom teachers, an autism coordinator, Donna Yocum, who was a counselor, and J.L.'s parents. R-45 at 310, 315-18.

During his eighth grade year J.L. was transferred out of science and into Read 180 to address his difficulties with reading comprehension. Def. Tab 6, ¶ 66 (citing Tr. III at 155). J.L. passed all of his classes in eighth grade with the exception of a D in PE during the first marking period; his grades ranged from A's to C's. The grades of J.L.'s report card were not modified. Def. Tab 6, ¶ 67 (citing Tr. III at 208).

The IEP team met again on August 30, 2006, at which time J.L. was fifteen and entering the ninth grade. Records of this date reflect that J.L. attended a month long autism camp during the summer. Def. Tab 5. During J.L.'s ninth grade year he received fourteen discipline notices ranging in severity from theft (taking a digital voice recorder), for which he received a three day in school suspension, to skipping home room. Pl. Tab 29.

In an e-mail to Dan Lamb, dated February 5, 2007, J. L's mother, Mrs. LaFond, stated that she had read descriptions of J.L.'s classes for the next year, and that "based on his status right now," she did not think that he was "qualified for any of them"; that the principal was considering changes in J.L.'s IEP because of his "recent behavior"; that she was "so lost" and did "not know what to do anymore"; and that she and her husband were "even looking into a boarding school" for J.L., which "specializes in kids with aspergers and adhd." Def. Tab 44, R-63 at 429-30.

At 2:43 p.m., on April 17, 2007, Mrs. LaFond wrote to Daniel Lamb, J.L.'s case manager, requesting an IEP meeting as soon as possible. At the Due Process Hearing, Ms. LaFond testified that at the time she sent this e-mail she did not feel that J.L. was "receiving the academic and social

education he need[ed]," and that she wanted "to discuss the placement of [J.L.] into a special education environment in the form of a boarding school." Def. Tab 34, R-63 at 437.

Shirley A. Kaczmarski, Ed.D., wrote a letter dated April 23, 2007, to "whom it may concern," in which she stated that she is not a special educator and not a licensed medical professional"; that her background includes advanced degrees in education and educational administration, as well as teaching at the high school level; that she was the Director of Electus Academy, a private alternative school for emotionally disturbed children; that she had been J.L's private tutor for the prior two years; that she had worked with him on homework completion two evenings a week throughout his eighth and ninth grade years as well as reading comprehension, transition form dependent to independent learning, and "specific skills to compensate for his variety of learning and emotional disabilities"; that she had "not observed significant development in the skills upon which [they] [had] so diligently worked"; that J.L. continued to have "difficulty focusing, even for small periods of time"; that his thoughts "consistently wander from the subject at hand"; that J.L. was "frustrated by the difficulties facing him and this can cause emotional outbursts and obsessive behaviors"; that to experience success as an adult J.L. required individual instruction "during all phases of the learning process" and "constant repetition and attention during all phases of the learning process." Pl. Tab. 12, Ex. EEEE.        The IEP team met on April 26, 2007.  No IEP document was completed.  The IEP team met again on May 4, 2007, to discuss a new IEP covering the rest of the school year and J.L.'s sophomore year. Def. Tab. 5.  Prior to the start of the May 4, 2007 IEP meeting, J.L.'s parents submitted a document,  with a page titled "where we see [J.L.] today," in which they stated, among other things, that his MAP scores were in the basic to below basic ranges; that his  final test scores for the first semester were an average of 1.0; that there was "virtually little progress toward becoming an independent learner"; that "little or new improvement" was made in regard to his "poor reading comprehension"; that J.L. had difficulty

"expressing himself verbally or in written form"; that he could not "keep pace with the curriculum"; that he was not "learning the basics before moving to more complex topics"; that truancy and lack of participation in certain classes were a concern; that J.L. lacked the ability to connect his current behavior to possible consequences; that he had "virtually no real peers at school and therefore very few friends"; that he perceived school as unsafe from bullying and harassment; that J.L. was emotionally, socially, and physically immature compared to the majority of his classmates; that he lacked healthy and successful coping skills; that he lacked sufficient understanding of his disability; and that he had poor eating habits which were affecting his overall health; and that at lunch he either ate very little or ate available junk food. Also, in regard to their "recommended solutions," J.L's parents stated, among other things, that J.L. required the following: more one on one teaching; an educational program designed around J.L.'s specific learning style and interests; tutoring after school for at least four hours a week; smaller "chunks" of instruction; personal assistance with schedule changes; closer monitoring of his location to prevent skipping classes; his being provided with a positive reinforcement system; extracurricular activities with like peers; a "much more emotionally safe environment"; monitoring during lunch; therapeutic programs to help in problem solving, reading comprehension, self management and self expression; a counselor or psychologist who is available on a daily basis; a lap top; and J.L.'s being taught keyboarding for his educational needs. J.L.'s parents further stated that after assessing J.L.'s overall academic performance, they decided to remove him from Francis Howell North High School and to place him in a private therapeutic educational institution. Pl. Tab. 30, R-52.

At the May 4, 2007 IEP meeting J.L's parents complained about the difficulty of getting J.L. to do his homework and his mother said that she had been doing J.L.'s homework. Def. Tab I, Tr. at 87; Def. Tab 4, Tr. at 139. The District proposed increasing the number of J.L.'s special education

classes from three to five, commencing with the 2007-2008 school year. The proposed IEP included five goals which were: Goal 1, increasing J.L.'s attention to class work and behavior by 75% in 3 out of 4 trials; Goal 2, increasing his organizational skills by 20% in 3 out of 4 trials; Goal 3, increasing his reading comprehension skills "by answering literal and inferential questions from a given story or passage with at least 75% accuracy in 4/5 trials"; Goal 4, increasing his "math reasoning skills in order to solve 2 and 3 step problems with at least 80% accuracy in 4/5 trials"; and Goal 5, increasing "pragmatic language skills by participating in therapy/classroom activities as instructed by the SLP/teachers with 80% accuracy per targeted skills."

The May 4, 2007 IEP noted that J.L. had a medical diagnosis of bipolar disorder; that he was currently taking Seroquel, Lexapro, Tenex, Adderall, Lithium, and Lamital; that teachers noted the J.L. was "making positive strides in several areas"; that he was completing his assignments on a regular basis, getting along better with his peers, and "doing a better job at thinking before he acts"; that some teachers noted that J.L. "still [had] difficulties with studying and taking tests"; that science was "a rather difficult class to be successful on tests"; that J.L. "continue[d] to spend a lot of time studying with his parents and tutor, but [was] still receiving below average grades on [science] tests"; that he was "occasionally [ ] found off task and only need[ed] a quick prompt to get back on focus"; that he "appeared to enjoy drawing" and would "chose to do this even if he [was not] finished with his own work"; and that "at times" J.L. would lose information that was "critical due to his interest in drawing and reading." The May 2007 IEP further stated that when J.L. was last evaluated in May 2006 he had the following WISC-IV scores: Full Scale IQ of 78; Verbal Comprehension of 99; Perceptual Reasoning Index of 88; Working Memory of 59; and Processing Speed of 75. The May 2007 IEP stated that these scores showed that J.L.'s overall performance on the WISC-IV indicated that he was "in the borderline range of intellectual functioning"; that he demonstrated a strength on the Verbal

Reasoning and the lowest on the Matrix Reasoning subtexts; that his general verbal comprehension was in the average range and general perceptual reasoning in the low average range; that four out of five teachers who rated J.L. based on the BASC Rating Scale which he was administered rated him as either at risk or "significant"; that on the WIAT-II, J.L. received standard scores of 99 in Work Reading, 82 in Reading Comprehension, 73 in Numerical Operations, 79 in Math Reasoning, 91 in Spelling, and 94 in written expression, none of which scores were below the "critical level"; that J.L.'s scores on the Asperger's Rating Scales indicated that he had "mild characteristics of autism through his development as a young child, but scores were somewhat inconsistent"; that "observations at school did not indicate any adverse effects educationally"; that a occupational therapy referral identified areas which might "impede [J.L.'s] learning," including attention to task, change in routine, and transitioning from one activity to another; that the MAP test administered at the end of J.L.'s seventh grade year "indicated that [he] obtained a Step 1 with a MAP score of 633 on Communication Arts and a Step 1 with a MAP score of 634 on the science portion"; and that on the Tera Nova test administered in the beginning of the 2005-2006 school year J.L. had a total score of "1%ile." Def. Tab 31, R-54.

The May 4, 2007 IEP also stated that between May 4 and May 31, 2007, in regard to math calculation, organizational/study skills, J.L. was to receive 150 minutes of special education services, with his receiving such services five times a day in a special education setting; that, in regard to written expression, he was to receive 50 minutes during this period, with his receiving such service five times a day in regular education setting - CWE; that, in regard to math calculation, written expression, organizational and study skills, he was to receive 250 minutes during this period, with his receiving these services five times a day in a special education setting; that, upon his or his teacher's request, J.L. was to be provided with extra time for completion of tests; that upon his or his teacher's request,

22

J.L. would take tests in a small group setting; that J.L. would be given preferential seating; that he would be provided a home set of textbooks; that he would receive reinforcement, using positive reinforcers and frequent reminders of the rules; that he would be given extended time for completion of assignments; that J.L. wanted to continue his education after high school, "most likely at the Community College to take classes in art"; and that in the area of independent living arrangements, J.L. was "currently developing the necessary skills needed to live on his own." The May 4, 2007 IEP increased J.L.'s special education classes from three to five beginning with the 2007-2008 school year and added language services to address deficits in pragmatic language. R-54 at 377-96.

On May 24, 2007, the IEP team determined that J.L. needed "additional support to be successful" and that, therefore, he would have "an increase in special education minutes from 150 minutes to 250 minutes beginning at the start of the 2007-2008 school year." Def. Tab 33, R-59.

On August 21, 2007, it was noted in the May 4, 2007 IEP that J.L. was making sufficient progress in all of his goals. R-54 at 382-86. J.L. passed both semesters of all his classes during the 2006-2007 school year and received A's, B's, and C's. He received an F on his first semester exam in Communications Arts, and received a B as a final grade because his first and second quarter grades were an A and B, respectively. J.L. earned seven credits towards graduation during the 2006-2007 school year. He needed a total of twenty-four to graduate and was "ahead of track" in regard to credits needed to graduate. His class rank at the end of the school year was 248 out of 504 students. Def. Tab 20, R-64 at 447-49; Def. Tab. 4, Tr. at 107.

In the Social Skills Questionnaire portion of the Application to Devereux, Mrs. LaFond stated, among other things, that J.L. fought with "parents not anyone else"; that he argued with "parents only"; that he talked back only to his parents when corrected; that he had temper tantrums "only at home"; and that the frequency of this conduct was "very often." Def. Tab 25, R-89 at 781. In a

section of the application dealing with behavior in the pervious four weeks, Mrs. LaFond stated as follows: that J.L. failed to control his anger "at home only"; that he demanded adult approval and praise only of his mother; that he destroyed or damaged property "at home only"; that he hurt, pushed, or physically threatened "dad only"; that in regard to arguing with adults, he did so with "parents only"; and that he appeared easily annoyed with others, "mostly [with] dad." R-89 at 782.

An IEP meeting was held on September 17, 2007, during which Mrs. LaFond requested that the District pay for J.L. to attend Devereux.

A Notice of Action, dated September 24, 2007, states that the request of J.L.'s parents for the District "pay for outside contractual placement at public expense" was denied. The basis of the District's action in the Notice of Action was J.L.'s "grade reports, progress on IEP goals and objectives, teacher observations, discipline records, and evaluation report." The Notice of Action further states that the information presented by J.L.'s parents at the September 17, 2007 IEP meeting was considered in the District's decision. Def. Tab 36, R-84 at 685.

J.L. received A's, B's, and C's during his first year at Devereux. Def. Tab 23, R-86 at 727. J.L. testified in his deposition that Devereux helped him get away from home and try to be more independent, and that school helped him to control his disorders, pay attention, and do better in school work. [7] From July 1, 2007 to June 30, 2008, the cost of Devereux was as follows: $20,097 for room and board, $46,540 for treatment, and $39,137 for education. The total cost, not including transportation, was $105,774.

## C.    Due Process Hearing:

---

[7]    The court notes that J.L.'s deposition is not included in the exhibits before this court. References to his deposition are as stated by the decision of the Due Process Hearing Panel, citing Pet. Ex. GGGG.

J.L.'s parents filed a Due Process Hearing Complaint on December 28, 2007. In the Due Process Complaint they requested reimbursement for the cost of Devereux, future costs, transportation costs, and future transportation costs. J.L.'s parents also alleged that the District failed to provide J.L. with a FAPE commencing January 2006 by failing to implement the IEPs applicable to J.L.'s 2005-2006 school year and by failing to develop IEPs in subsequent years which were reasonably calculated to provide education benefit to J.L. J.L.'s parents further alleged that because of these failures they were forced to place J.L. in Devereux.

The District filed a Response to the Due Process Complaint. A Due Process Hearing was held before a three-person panel on November 19, 2008. At the Due Process Hearing, J.L.'s and his parents' witnesses included Mr. and Mrs. LaFond, Dr. Kaczmarski, and Dr. Ralph Caraffa. The District's witnesses included Pat Curry, Dr. Martin Rosso, Travis Bracht, Julie Troxell, Linda Lott, Janelle Louis, Deborah Mason, Adam Corbitt, Edward Gettemeier, and Beth Blumenstock.

Ms. Troxell, J.L.'s case manager during his eighth grade year, testified that she has an undergraduate degree in secondary education, speech, and language, a master's degree in special education, and certifications in special education, grades K-12, in speech and language, grades 6-12, and in communication arts, middle school. Def. Tab. 6, ¶ 59 (citing Hearing Transcript ("Tr.") III at 145.[8] Further, Ms. Troxell testified that she saw J.L. several hours a day during the 2005-2006 school year, worked with him in three general education classes, and worked with him in a class called Academic Lab, where she worked with J.L. on his homework, organizational skills, and "anything that he needed additional assistance with to help him achieve better academically." Def. Tab 6, ¶ ¶ 60-61(citing Tr. III at 147-48). Ms. Troxell also testified that J.L. appeared to "come out of his shell"

---

[8]     The complete hearing transcript of the Due Process hearing is found at Defendant's Tabs 1-5.

during eighth grade; that he was able to work in small groups; that he developed friendships that he did not have before; that he offered in class by raising his hand, and participating; and that his "overall affect seemed to change, to be happier." Def. Tab 6, ¶ 68 (citing Tr. III at 195).

Beth Blumenstock, Chairperson of the Francis Howell North High School Special Education Department, testified that she had an undergraduate degree in special education and a master's degree in education administration and that during the 2006-2007 school year J.L. was enrolled in a Studies course, which is an organized study hall, with a special education teacher. Ms. Blumenstock further testified, in regard to the May 2006 IEP's reference to J.L's goals of increasing his attention to class work and behavior, that the reasons for the drop was that "he was getting older, the moving on to [his] sophomore year, although he was making progress, the [classroom] expectations are a little higher as you move on through high school"; that the main reason for the drop in percentage was "concerns that were expressed by mom about changes with [J.L.], expectations being too high"; that in response to his mother's concerns, J.L. was put in a more supportive environment and the percentages for his goals were examined; that J.L. did not cause trouble at school; that Heritage Landing is an alternative program which is separate from Francis Howell's three public high schools; that Heritage Landing has twenty-five students, total, with four or five teachers and is therapeutic in nature; that Ms. Blumenstock did not feel a need to suggest that J.L. be at Heritage Landing because he was "showing progress," because "there were no behavioral concerns," and because academically "he was okay"; that he was moved to a "self-contained classroom" because the school was told that "mom was doing his homework at night, and that it was becoming too much"; that Francis Howell had six crisis counselors and a keyboarding class, in which J.L. was to participate during tenth grade; that each classroom has at least one computer; and that based on her thirteen or fourteen years of special education services, the program that Francis Howell School District was proposing for the 2007-2008

school year was reasonably calculated to provide J.L. with a free, appropriate, public education. Def. Tab 4, Tr. at 122-84. Ms. Blumenstock testified that in the May 4, 2007 IEP J.L.'s goals were revised to reflect that it was anticipated that work in J.L.'s sophomore year would be more difficult and in recognition of parental input with respect to the amount of time that J.L. was spending on homework. Def. Tab 4, Tr. at 139-40. Ms. Blumenstock testified that she thought that J.L.'s parents were in agreement with the proposed revisions to J.L.'s IEP. Def. Tab 4, Tr. at 176-77.

Adam Corbitt, J.L.'s math teacher during the 2006-2007 school year testified at the Due Process Hearing that he has undergraduate degrees in elementary regular education and in special education, cross-categorical; that he was in contact with J.L.'s case manager, Mr. Lamb, regarding J.L. during the school year; that J.L. passed Mr. Corbitt's Introduction to Algebra class; that J.L. had a final grade of C; that he had B's in the first two grading periods, a C in the third, and a D in the final quarter; that Mr. Corbitt did not recall anything specific that caused J.L.'s final exam grade to drop; that J.L. was not a "loner" and had friends in Mr. Corbitt's class; that he saw J.L. interact with other students in the classroom; that because Mr. Corbitt's classroom was small, with twelve students, J.L. stayed in Mr. Corbitt's room to take exams; that J.L. received extra time to take tests; that when Mr. Corbitt told J.L. to slow down and not rush through his work, J.L. responded "generally, pretty well"; that J.L. never became oppositional and defiant; and that J.L. never yelled at Mr. Corbitt. Def. Tab 4, Tr. at 68-74.

J.L.'s Social Studies teacher in the Special Education Resource class was Linda Lott. Ms. Lott testified at the Due Process Hearing that she has an undergraduate degree in special education and a master's degree in general education, and teaching certifications in teaching students with learning disabilities, with emotional disturbances, and students who are educably mentally disabled. Ms. Lott further testified that she implemented the accommodations and modifications in J.L.'s IEP as needed;

that J.L. performed very well in her class; that she observed that he improved significantly with work completion and in his overall grades; that he was doing ninth grade work in her class; that, although J.L. was taught social studies in a special education classroom, the curriculum was very closely aligned to the general education curriculum; that the difference in curriculum was that Ms. Lott modified some of the work so that it could be done as a group in class, or orally, instead of being written; that she utilized a daily checklist with J.L.; that J.L. improved socially during the 2006-2007 school year and interacted appropriately; that she "saw big improvements with his social interaction"; that J.L. responded well to her directives; and that she saw J.L. talk to other students in the hallway. Def. Tab 3, Tr. at 209-250. Mrs. LaFond testified that Ms. Lott "was a great example that children like [J.L.] can learn if given the right environment and with the right teachers. ... I know he didn't do well on every assignment in there, but she had him working, and she was teaching him how to take notes, and he could learn." Def. Tab 2, Tr. at 97.

Janelle Louis was J.L.'s PE teacher during ninth grade. Ms. Louis testified at the Due Process Hearing that, on at least one occasion, J.L. skipped PE to play Nintendo with another student; that on four occasions he did not dress for PE; that when he did not dress for PE he would participate in PE in his street clothes; that in the fourth quarter J.L. received an 82% in PE, which is a B; that in the third quarter he received a 73%, which is a C; that "overall [J.L.] received a 76 percent, C and D final grade, semester grade"; that J.L. completed the written work which was assigned for PE; that this written work was done in class; that there were no "behavioral incidents" with J.L. in Ms. Louis's PE class; that J.L. never refused to do what Ms. Louis asked him to do; that by the beginning of the year J.L. was "stand-offish"; that Ms. Louis believed this was because J.L. "did not know a lot of the kids"; that "by the middle of the year to the end of the year he was playing with every kid" and was "in on every sport playing with different kids"; that she did not read exams which she gave to J.L.; that Ms.

Louis was given a copy of J.L.'s IEP and was aware of the accommodations and modifications called for in his IEP; that she implemented these, as appropriate; and that, in regard to J.L.'s test taking, she sent him to his Case Manager, Dan Lamb. Def. Tab 3 at 251-65.

Martin Rosso testified for the District at the Due Process Hearing. Dr. Rosso has a bachelor's degree in psychology and a master's degree and a Ph.D. Dr. Russo addressed the concerns of J.L.'s parents regarding the disparity between J.L.'s WISC or IQ scores. In this regard, Dr. Russo testified that when going from WISC-III to WISC-IV, there is a significant increase in the number of tests that relate to working memory and processing speed, which are both highly influenced by one's ability to concentrate and focus; thus, scores of a child with ADHD could be impacted; that the verbal part of the test is not much affected by attention; that IQ scores will drop for students with ADHD and bipolar disorders; that he noted that behavior observations during the WISC-IV testing indicated that J.L. had not been very attentive; that medications can be a significant influence on test scores; that J.L.'s WIAT-II score showed no learning disabilities based upon state criteria; and that his WIAT-II score showed that J.L. was making some progress in his education, although he had a weakness in math. Def. Tab 3, Tr. at 34, 37-38, 46-50, 856-58, 863.

A report from Ralph Caraffa, Ph.D., was submitted at the hearing. Dr. Caraffa stated in his report that he saw J.L. from December 2003 to October 2005; that Devereux, where J.L.'s parents had placed him in October 2007, is a therapeutic school which provides psychiatric, psychological, and educational therapy; that it has a strong behavior emphasis; that his contacts with staff members at this school and review of materials provided by the school "indicate that in the six months since the first review there [were] changes in [J.L.'s] behavior toward the measurable treatment goals"; that improvement was seen in "engaging peers positively and being respectful in all settings"; that there was improvement in coping skills; that J.L. had "more age appropriate behavior and engagement in

activities"; that family relations "appear[ed] to be improving"; that some problems experienced in the District still were noted, "but in all classes gains and improvement [were] part of the teacher's summaries"; that there had been "new supportive information" that J.L. had a "recent IQ test Full Scale Score of 110" within the prior to two months; that, in his opinion, it was "absolutely essential that a corresponding therapeutic residence accompany [J.L.'s] education in order for him to succeed educationally and develop into a young man who will eventually live independently." Def. Tab 24, R-87.

Also at the Due Process Hearing, Mrs. LaFond testified that she was in agreement with the proposal to increase the number of J.L.'s special education classes from three to five and that Dr. Kaczmarski had urged her to put J.L. in fewer CWC classes and in more special education classes. Mrs. LaFond testified that when Dr. Kaczmarski made this recommendation she "wanted to believe that [J.L.] could exceed in CWC classes. [She] didn't want him just in sped classes. The teachers told [her] that [J.L] was doing pretty good. [She] wanted to believe them, and as a mother, … didn't want to see how severe" his disabilities were. Def. Tab 1, Tr. at 295. Mrs. LaFond also testified that the passing grades which J.L. had in the seventh and eighth grades he did not earn himself. Tr. at 296.

Dr. Kaczmarski testified at the Due Process Hearing in regard to the concerns expressed in her April 23, 2007 letter. She also testified that, while in the tenth grade at Devereux, J.L. was performing "at the instructional level of 9th and 10th grade" in English; that J.L. took Geometry in tenth grade, which is a "typical tenth grade class"; and that J.L.'s Geometry instructor noted that he understood the concepts and was able to "verbally work through the concepts." Def. Tab 1, Tr. at 191-266.

**D.      Decision of the Due Process Panel:**[9]

First, the Panel considered the relevant documentation, including J.L.'s IEPs.  Second, the Panel considered the testimony at the Due Process Hearing.  Third, the Panel acknowledged the applicable law as set forth above, including the requirement of a FAPE, what is meant by a FAPE, the goals of the IDEA, and that, if a district fails to meet its obligation to provide a FAPE, parents may enroll their child in a private school and seek reimbursement.  In particular, the Panel considered that to establish that they are entitled to reimbursement for a private school, parents must establish both that the IEP proposed by the school district was not appropriate and that the private placement was appropriate to the child's needs.  The Panel further considered that the IDEA is not violated if the procedures set forth in it are followed and if the IEP is formulated to enable the child to receive educational benefits; that making measurable and adequate gains in the classroom is sufficient under the IDEA; that the IDEA has a strong preference that disabled students attend regular classes with non-disabled children and a presumption in favor of placement in public schools; and that to prevail on a claim of failing to implement an IEP, the challenging party must  show that the school district failed to implement substantial or significant provisions of the IEP.  The Panel also considered the allegations of J.L.'s parents, as stated in their Due Process Complaint; that J.L.'s parents bear the burden of proof in the matter; that if, at the conclusion of evidence, both sides are evenly balanced, the parents lose; and that the standard of proof is a preponderance of the evidence. Def. Tab 6, Decision at 25-28.

The Panel considered that if it is determined that a FAPE has not been denied, the second prong of the test for determining whether parents are entitled to reimbursement for private placement

---

[9]      The court notes that it has reviewed numerous administrative decisions and that the written decision of the Due Process Panel in the matter under consideration was among the most comprehensive, artfully written, and legally accurate decisions it has ever reviewed.

need not be addressed. Decision at 29. Thus, the Panel first considered whether J.L.'s IEP addressed all significant factors of his disability so that he received educational benefit as required by the IDEA. In this regard, the Panel considered that in CJN v. Minneapolis Public Schools, 323 F.3d 630, 638 (8th Cir. 2003), the Eighth Circuit held that, where a student has a complicated history of psychiatric problems, whether a student has made academic progress is more relevant to the inquiry as to whether the child has received a FAPE than in other circumstances "because it demonstrates that his IEP's were not only reasonably calculated to provide educational benefit, but at least in part, did so as well." The Panel further considered that specific results are not mandated under the IDEA. In this regard, the Panel noted that J.L. made academic progress as evidenced by his grades, his ranking in the top-half of his freshman class, and his earning 7 of the 24 credits needed to graduate from high school. Decision at 30.

The Panel then found that all of J.L.'s IEPs were reasonably calculated to provide educational benefit because they considered his present levels of academic achievement, a statement of his measurable annual goals, a statement of how goals would be measured, a statement of the special education and related services J.L. would receive, an explanation regarding the least restrictive environment, and a statement of modifications and accommodations as required by the IDEA, 35 C.F.R. § 300.320. Decision at 31. The Panel further considered that J.L.'s parents asserted that the IEPs were defective because: (1) the PLEP section kept repeating and failed to address why J.L. did not perform well on tests in that he did not comprehend the material when he read it on his own, and (2) the IEPs failed to address why J.L.'s IQ scores dropped. The Panel considered that an IEP is not legally insufficient because it repeats prior PLEP language and stated that, ideally, the District should have answered the question regarding J.L.'s test taking issues. The Panel found, however, that the District did provide support and accommodation for J.L. to help with his taking tests in all three IEPs

32

and that, additionally, J.L. was either in CWC or special education classes under those IEPs so he had extra assistance by the nature of those classes. Decision at 31-32.

In regard to the argument of J.L.'s parents that the PLEP section should have addressed the decline in his IQ scores from the WISC-III to the WISC-IV, the Panel stated that ideally the District might have explained that the drop in scores resulted from an increase in the components in the tests; that studies have shown that when IQ tests are renormed there is a decline in scores; and that scores are impacted negatively for children such as J.L. who have ADHD and bipolar disorders because of the emphasis on working memory and processing speed requiring an ability to concentrate and focus. In particular, the Panel considered that adding fancier language to his IEPs would not have made a difference to J.L.'s education and that the purpose of the IDEA, is not to "paper files," but to provide educational opportunities to children with disabilities. Decision at 32.

The Panel factually distinguished cases cited by J.L.'s parents in which the courts found that children were not receiving educational benefit and that private placement was warranted. In this regard the Panel noted that, while J.L. was not a model student, J.L.'s conduct did not come close to the problems of the children in the cases cited by his parents and that no teacher opined that J.L.'s behavior impeded his ability to learn and make educational progress. The Panel found it significant that Mrs. LaFond had represented on the questionnaire for Devereux that J.L.'s behaviors were at home with his parents and found that, if J.L.'s parents decided to enroll him in Devereux based on behavior problems at home, there is no basis to recover reimbursement of their private placement decision. Decision at 33 (citing A.S. v. Madison Metro. Sch. Dist., 477 F. Supp.2d 969, 979 (W.D. WI 2007)).

Next, the Panel considered that any defects in J.L.'s earlier IEPs, commencing January 2006, cannot be the basis for recovery from the District because they were superceded by the May 4, 2007

IEP. Thus, the Panel analyzed the May 4, 2007 IEP and considered the claims of J.L.'s mother that his grades were not reflective of his work because she had been doing some of his homework; that she repeated complaints concerning the amount of homework and the difficulty of J.L.'s getting the homework done; that, in response, the District increased J.L.'s special education classes from three to five; that his mother agreed with this; and that the District proposed a decrease in the percentages for the goals compared to previous IEPs based on the likelihood that the work would be more difficult in J.L.'s sophomore year and in recognition of the parental input. To the extent that J.L.'s parents argued that the decrease in the percentages supports their contention that the May 4, 2007 IEP was not reasonably calculated to provide a FAPE, the panel considered that the percentages did not alone mean a lack of potential benefit from the May 4, 2007 IEP. Decision at 34-35 (citing Hjortness v. Neenah Joint Sch. Dist., 507 F.3d 1060, 1063-64 (7th Cir. 2007) (upholding the finding of a FAPE where four goals originally set at a percentage of 50% were decreased by the IEP team). To the extent that J.L.'s parents expressed concern about his need for twenty-four hour "conditioning, that is, to be in a place where the skills from one setting would transfer to another," and to the extent that Dr. Caraffa and Dr. Kaczmarski offered their opinions in support of the parents' concern, the Panel found that the IDEA does not require the need for generalization of skills to achieve self-sufficiency and independence where a student is making some progress in school. Decision at 35. The Panel found that "even if a child might benefit more from residential placement, the school district is not required to pay for that expense if the child can receive an adequate, if not as good, education in the public school." Decision at 35-36. As such, the Panel found that: (1) the District fully implemented the relevant IEP for the 2006-2007 school year; (2) the IEPs developed for J.L. for this school year provided a FAPE in the Least Restrictive Environment; and (3) J.L.'s proposed IEP developed in May 2007 was reasonably calculated to produce a FAPE in the Least Restrictive Environment for the 2007-

2008 school year.   Because J.L.'s parents did not show beyond a preponderance of the evidence that the District did not provide a FAPE, the Panel found that it did not have to address other issues raised by J.L.'s parents dealing with the appropriateness of J.L.'s placement at Devereux and their request for reimbursement. Decision at 36.

**E.      Discussion of Counts I and II:**

Counts I and II of Plaintiffs' Second Amended Complaint filed with this court allege that the Due Process Panel erred in regard to its finding that the District provided J.L. with a FAPE; that the District violated the IDEA because it did not provide J.L. with a FAPE; and that the decision of the Due Process Panel was arbitrary, capricious, and unreasonable and that it is unsupported by competent and substantial evidence and inconsistent with the preponderance of the evidence.  In Count II, J.L.'s parents, seek monetary damages to compensate them for financial losses incurred as a result of the District's violating J.L.'s rights. Count I is specific to J.L. and Count II is specific to J.L.'s parents.

First, to the extent Plaintiffs argue that a traditional summary judgment standard is applicable, Plaintiffs are misguided. The court has set forth above the standard by which it must be guided in addressing Plaintiffs' Second Amended Complaint.  Plaintiffs contend, in support of their Second Amended Complaint that this court should make its own determination as to whether the District provided J.L. with a FAPE, although Plaintiffs acknowledge that this court must give due weight to the decision of the Due Process Panel.  As stated by the Eighth Circuit, however, this court may not substitute its notions of what is a sound judicial policy for that of the school authorities who considered Plaintiffs' allegations. See Neosho, 315 F.3d at 1022.  Upon addressing the pending Motions for Summary Judgment, the court will follow directives of the United States Supreme Court and of the Eighth Circuit in regard to judicial review of the decision of the Due Process Panel.  In so doing, the court will give due weight to the decision of the Due Process panel and apply a

preponderance of the evidence standard, which is more stringent that a substantial evidence standard. See T.F., 449 F.3d at 818; Neosho, 315 F.3d at 1022; Strawn, 210 F.3d at 958; ISC No. 283, 88 F.3d at 561. Additionally, the court will review the administrative record and consider the panel members' expertise and that they had the opportunity to observe the demeanor of witnesses and determine their credibility. See T.F., 449 F.3d at 818; ISD No. 283, 88 F.3d at 560-70. The court will also consider the factual findings of the Due Process Panel as prima facie correct. See Neosho, 315 F.3d at 1022.

Plaintiffs argue before this court that J.L.'s IEPs were insufficient, that the District did not provide J.L. with a FAPE, and that, therefore, they were entitled to reimbursement for J.L.'s private school enrollment. The Due Process Panel considered the two-part test applicable to whether J.L.'s parents were entitled to recover funds spent for his unilateral placement at Devereux. See Neosho, 315 F.3d at 1026-27. The Due Process Panel found that it was best to first determine whether J.L. received a FAPE, because the failure to provide a FAPE for J.L. was a prerequisite to his parents prevailing on their claim for reimbursement for the cost of providing J.L. with a private school education. As considered by the Due Process Panel, a factor in determining whether a student has received a FAPE is whether he has made academic progress. Indeed, the Eighth Circuit held in CJN v. Minneapolis Pub. Schs., 323 F.3d 630, (8th Cir. 2003), that "'[a]s long as a student is benefitting from his education, it is up to the educators to determine the appropriate educational methodology.'" (quoting Fort Zumwalt, 119 F.3d at 614). See also T.F., 449 F.3d at 820. The Panel found that J.L. was benefitting from his education and that he made academic progress as evidenced by his *grades* and *class rank* in the top half of his freshman class, as well as by his having *earned 7 of 24 credits needed to graduate* high school, and by his being able to *perform sophomore work at Devereux*. Upon reaching the conclusion that J.L. made academic progress the Due Process Panel also considered that

J.L.'s math teacher, during the 2006-2007 school year, Mr. Corbitt, opined that J.L. was making meaningful progress during that school year; that Mr. Corbitt was a case manager, although he was not J.L.'s case manager; and that Mr. Corbitt testified that J.L.'s interactions with students were typical of ninth grade students. Having had the opportunity to observe Mr. Corbitt, the Due Process Panel found him credible. See IDS No. 283, 88 F.3d at 561. Upon its review of the administrative record, based on a preponderance of th evidence, and giving due weight to the decision of the Due Process Panel, the court further finds that J.L. received educational benefits and made academic progress while enrolled in the District and that the decision of the Due Process Panel in this regard should be affirmed. See T.F., 449 F.3d at 820.

Plaintiffs contend that the Due Process Panel ignored testimony from District employees, including Ms. Troxell, a special education teacher at Barnwell Middle School, and that Ms. Troxell allegedly contradicted her prior testimony. In particular, Plaintiffs contend that Ms. Troxell contradicted herself because she testified that during ninth grade J.L. had no behavior problems at school; because the May 4, 2007 IEP stated that J.L. was impulsive and acting without thinking; and because she testified that, despite attempts to improve J.L.'s organizational problems, he continued to have difficulty. Ms. Troxell testified that she was J.L.'s case manager during his *eighth grade year, not his ninth grade year.* Noting her education and experience, the time she spent with J.L., and her familiarity with J.L.'s IEPs, including stated accommodations and modifications, the Due Process Panel found Ms. Troxell very credible. The Due Process Panel relied on Ms. Troxell's testimony that repetition of goals did not mean that J.L. was not making progress, that J.L. did well behaviorally and socially, that he came out of his shell, that he was able to work in small groups, that he was offering in class, and that he seemed to be happier. Further, upon reaching its conclusion that J.L. was receiving a FAPE and that his parents request for reimbursement should be denied, the Due Process Panel

considered, in detail, the testimony of the numerous witnesses, their educational background, their familiarity with J.L. and his IEP's, and their opinions as to his progress and special needs. The court finds that the Due Process Panel was in a position to evaluate Ms. Troxell's credibility and the credibility of other witnesses and that the court should not substitute its judgment in this regard. See IDS No. 283, 88 F.3d at 561. As stated above, and as acknowledged by Plaintiffs, it is the role of the Panel to determine the credibility of witnesses. See Neosho, 315 F.3d at 1022. The court finds, therefore, that Plaintiffs' argument, in regard to resolutions of conflicts in testimony by the Due Process Panel, is without merit.

In support of their position that J.L.'s IEPs were not appropriate, Plaintiffs argue that their inappropriateness is evidenced by their repetition of goals. As stated above, Ms. Troxell's testimony contradicted this assertion and the Due Process Panel accepted her explanation. The court notes that the administrative record demonstrates that revisions in J.L's IEPs reflect J.L.'s needs, changes in curriculum through the grades, and the concerns of his parents. Specifically, contrary to the suggestion of Plaintiffs, and as noted by the Due Process Panel, the IEPs addressed J.L.'s reading difficulties by placing him in Read 180 to address difficulties with reading comprehension. Moreover, on May 24, 2007, the IEP team supplemented the May 4, 2007 IEP and increased J.L.'s special education minutes from 150 minutes to 250 minutes beginning at the start of the 2007-2008 school year. Significantly, one of Plaintiffs' experts, Dr. Kaczmarski, contributed to the development of J.L.'s IEP, as did his mother. See Bradley ex rel. Bradley v. Arkansas Dept. of Educ., 443 F.3d 965, 974-75 (8th Cir. 2006) (noting that many of the suggestions of the child's parents were considered in the development of the disabled child's IEPs). Moreover, the sufficiency of J.L.'s IEPs is evidenced by his progress, as set forth above, including his class rank and grades at the end of ninth grade. Based on a preponderance of the evidence and giving due weight to the decision of the Due Process Panel,

the court finds that the Due Process Panel's determinations that J.L.'s IEPs were sufficient, that they were calculated to provide him with educational benefit, and that they met the requirements of the IDEA, 35 C.F.R. § 300.320, should be affirmed. See T.F., 449 F.3d at 820. The court finds, therefore, that Plaintiffs' arguments that the IEPs were insufficient, that they failed to comply with the IDEA, and that they were inappropriate are without merit.

To the extent Plaintiffs contend before this court that the Due Process Panel distorted time frames in their decision and to the extent Plaintiffs contend that J.L.'s advancing through the grades does not establish that he was making progress, the court notes that the Due Process Panel's decision meticulously and copiously sets forth details of J.L.'s IEPs, test results, and testimony of witnesses, including witnesses who testified on behalf of J.L.'s parents. Upon its review of the administrative record and based on the preponderance of the evidence, the court finds without merit Plaintiffs' arguments that the Due Process Panel distorted time frames and erred in finding that J.L.'s advancing through the grades establishes that he was making progress.

Plaintiffs contend that the District did not implement the May 2007 IEP. To prevail on a claim challenging the implementation of an IEP, the aggrieved party "must show more than a de minimis failure to implement all elements of that IEP, and instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP." Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 349 (5th Cir. 2000); Neosho, 315 F.3d at 1027. As found by the Due Process Panel, the District provided support and accommodation for J.L. in taking tests. Also, J.L. was either in CWC or special education classes and he had extra help in those classes. Based on a preponderance of the evidence and giving due weight to the decision of the Panel, the court finds that J.L.'s IEPs were implemented; that the decision of the Panel, in this regard, should be affirmed; and that Plaintiffs have not met their burden to establish to the contrary. See id.

To the extent that J.L.'s parents contend that the May 2007 IEP was not implemented for the remainder of the 2006-2007 school year, the preponderance of the evidence and the undisputed facts, as discussed and set forth above, establish the contrary. The May 2007 IEP not only addressed the last few months of the 2006-2007 school year but addressed the 2007-2008 school year as well. J.L.'s parents never enrolled J.L. in the District during the 2007-2008 school year. Under such circumstances, J.L.'s parents are not in a position to allege that the May 2007 IEP was not implemented during the 2007-2008 school year.

The court notes, in accordance with the requirements and preferences of the IDEA, that, while enrolled in the District, J.L. received personalized instruction and was educated in a regular public school, with non-disabled peers. See T.F., 449 F.3d at 820. Because J.L.'s IEPs complied with the IDEA, because the IEPs were implemented, and because J.L. was receiving educational benefit, the court finds, based on a preponderance of the evidence and giving due weight to the decision of the Due Process Panel, that J.L. was receiving a FAPE while enrolled in the District. See id. The court further finds that the decision of the Due Process Panel, in this regard, should be affirmed.

Plaintiffs contend that even if J.L. was receiving a FAPE, the District can be required to pay for his private school placement. The court has set forth, above, the standard applicable to determining whether parents can be reimbursed for the cost of enrolling a student in a private school. The court has found, above, based on a preponderance of evidence, that the Due Process Panel correctly found that J.L.'s IEPs were sufficient and that he was receiving a FAPE. Under such circumstances, the District is not required to pay for a private education for J.L. See 34 C.F.R. § 104.33(c)(4); T.F., 449 F.3d at 820; Gill, 217 F.3d at 1035. Moreover, as stated, above, J.L.'s parents are not entitled to be reimbursed for the cost of Devereaux merely because they disagreed with the May 2007 IEP. See Rowley, 458 U.S. at 195; Doe v. Bd. of Educ., 9 F.3d at 459-60.

To the extent Plaintiffs argue in support of their claim that they are entitled to be reimbursed because J.L.'s IEPs did not address his social and emotional issues, the Eighth Circuit has held that Congress recognized that "social and emotional problems are not ipso facto separable from the learning process." Indept. School Dist. No. 284 v. A.C., 259 F.3d 769, 776-77 (8th Cir. 2001). The court has also recognized that "a problem resulting from a disability is separable from the learning process if the problem is not 'primarily educational.'" Id. at 777. In this regard, the Eighth Circuit held:

> If the problem prevents a disabled child from receiving educational benefit, then it should not matter that the problem is not cognitive in nature or that it causes the child even more trouble outside the classroom than within it. What should control our decision is not whether the problem itself is "educational" or "non-educational," but whether it needs to be addressed in order for the child to learn.

Id.

With these principles in mind, the Due Process Panel considered testimony regarding J.L.'s social interaction at school and found the persons who testified in this regard were credible. It also considered that no teacher expressed an opinion that J.L.'s behavior at school impeded his ability to learn and make educational progress. See IDS No. 284, 259 F.3d at 776-77. The Due Process Panel further considered information provided by J.L.'s mother on the questionnaire for Devereux, as set forth above, including that she noted his behaviors were either at home or with his parents. Consistent with the above discussed Federal Regulations and the holdings of the Eighth Circuit, the Due Process Panel considered that, to the extent that his parents enrolled J.L. in Devereux based on his behavior at home, there is no legal basis upon which they can be reimbursed for this placement. See 34 C.F.R. § 104.33(c)(4); T.F., 449 F.3d at 820; Gill, 217 F.3d at 1035; IDS No. 284, 259 F.3d at 776-77. The court finds, therefore, that based on a preponderance of the evidence and giving due weight to the decision of the hearing panel, that the Due Process Panel's decision that J.L.'s parents

are not entitled to reimbursement for his private school placement should be affirmed. As such, the court find that Plaintiff's arguments in this regard are without merit.

In summation, having reviewed the administrative record, based on a preponderance of the evidence, and giving due weight to the decision of the Due Process Panel, the court finds that the District did not violate the IDEA; that J.L.'s IEPs were legally sufficient; that he received a FAPE; that J.L.'s IEPs were implemented; that J.L.'s parents are not entitled to reimbursement for his placement at Devereux; and that, therefore, the decision of the Due Process Panel should be affirmed. The court finds, therefore, the Motion for Summary Judgment filed by Plaintiffs, should be denied and that the Motion for Judgment on the Record filed by the District, in regard to Counts I and II, should be granted. See Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 322; T.F., 449 F.3d at 820.

### III.
### Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq., Counts III and IV, Legal Framework and Discussion

Plaintiffs assert a claim in Counts III and IV for violation of § 504 of the Rehabilitation Act of 1973 ("RHA"). The District contends that judgment should be entered in its favor based on the record or that, in the alternative, summary judgment should be granted in its favor in regard to Plaintiff's RHA claims. Congress enacted the RHA, in part, to promote the inclusion and integration of persons with disabilities into mainstream society. 29 U.S.C. § 701(a). To accomplish this, § 504 of the RHA provides:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a).

In regard to the requirements for a cause of action under the RHA, a claimant must show that he is a qualified individual with a disability and that he was denied participation in, or the benefits of, the services, programs, or activities of a public entity because of his disability. Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998). Additionally, upon recognizing the relationship between § 504 of the RHA and the IDEA, the Eighth Circuit has held:

> We do not read § 504 as creating general tort liability for educational malpractice, especially since the Supreme Court, in interpreting the [Education for All Handicapped Children Act of 1975 (EAHCA), 20 U.S.C. s 1401 et seq.,][10] itself, has warned against a court's substitution of its own judgment for educational decisions made by state officials. We think, rather, that *either bad faith or gross misjudgment should be shown before a § 504 violation can be made out*, at least in the context of education of handicapped children. It is our duty to harmonize the Rehabilitation Act and the EAHCA to the fullest extent possible, and to give each of these statutes the full play intended by Congress. The standard of liability we suggest here accomplishes this result and also reflects what we believe to be a proper balance between the rights of handicapped children, the responsibilities of state educational officials, and the competence of courts to make judgments in technical fields. So long as the state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under § 504.

Monahan v. State of Nebraska, 687 F.2d 1164, 1170-71 (8th Cir. 1982) (emphasis added).

Whereas the IDEA imposes an affirmative duty on recipients of federal funds to provide a FAPE for disabled children, the RHA prohibits certain conduct on the part of recipients of federal assistance. Id. at 1170. Recognizing the relationship of the RHA and the IDEA, the District Court held in Breen v. St. Charles R-IV School District, 2 F. Supp.2d 1214, 1221 (E.D. Mo. 1997), that:

> Under 34 C.F.R. § 104.33, implementation of an IEP developed in accordance with the IDEA is one means of meeting the standard under the RHA. To show a violation of Section 504 of the RHA, plaintiffs must show "bad faith or gross misjudgment." Monahan v. State of Nebraska, 687 F.2d 1164, 1171 (8th Cir.1982). To show discrimination under the RHA plaintiffs must show more than the failure to provide a FAPE, an incorrect evaluation, or a faulty IEP. Id.

---

[10]     The EAHCA was renamed the IDEA in 1991.

In Heidemann v. Rother, 84 F.3d 1021, 1032-33 (8th Cir. 1996), the Eighth Circuit specifically reaffirmed the application of the requirement in Monahan, 687 F.2d 1164, that "either bad faith or gross misjudgment" be shown in order to impose liability under § 504 of the RHA. Hoekstra By and Through Hoekstra v. Independent Sch. Dist. No. 283, 103 F.3d 621, 624 (8th Cir.1996).

In the matter under consideration, Plaintiffs fail to allege in Counts III and IV that the District acted in bad faith or with gross negligence. See Hoekstra, 103 F.3d at 626; Monahan, 687 F.3d at 170-71; Gorman, 152 F.3d at 912. Moreover, in Breen, where the Plaintiffs alleged a violation of the IDEA, in addition to the RHA and where the court found that the record established that the school district had met its responsibility under the IDEA, the court further found that the school district was entitled to judgment as a matter of law on Plaintiffs' RHA claim. Id. Likewise, in the matter under consideration, the court has found, above, that the District met its responsibility under the IDEA. The court finds, therefore, that there are no genuine issues of material fact in regard to Plaintiffs' RHA claims in Counts III and IV; that the District's Motion for Summary Judgment in regard to the RHA claims of Counts III and IV should be granted; and that Plaintiffs' Motion for Summary Judgment as to the RHA allegations of Counts III and IV should be denied. See Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 322; Hoekstra, 103 F.3d at 626; Monahan, 687 F.3d at 170-71; Gorman, 152 F.3d at 912. As such, the court need not address the District's Motion for Judgment on the Pleadings as to Plaintiffs' RHA claims in Counts III and IV.

## IV.
## Title II of the Americans with Disabilities Act of 1990 - Counts III and IV

In Counts III and IV Plaintiffs allege a cause of action against the District pursuant to Title II of the Americans With Disabilities Act ("ADA") based on the District's alleged violations of the IDEA, including alleged failure to provide J.L. with a FAPE. The ADA is similar in substance to the RHA, and "cases interpreting either are applicable and interchangeable." Allison v. Dep't of Corrs.,

94 F.3d 494, 497 (8th Cir. 1996). The ADA itself states that "[t]he remedies, procedures, and rights" under § 504 of the RHA are also available under Title II. 42 U.S.C. § 12133; Gorman, 152 F.3d at 912.

A plaintiff under Title II of the ADA must, therefore, show that he is a qualified individual with a disability and that he was denied participation in, or the benefits of, the services, programs, or activities of a public entity because of his disability. Id. Likewise, a plaintiff asserting a cause of action under Title II of the ADA in the context of a handicapped child must establish *either bad faith or gross misjudgment*. Monahan, 687 F.2d at 1170-71. Thus, a school district does not violate the ADA in regard to the education of a handicapped child where it has exercised professional judgment in a manner not departing grossly from accepted standards among educational professionals. Id.

In Hoekstra, 103 F.3d at 627, the court applied the Monahan standard to the ADA. In particular, in Hoekstra, 103 F.3d at 627, the Eighth Circuit rejected an argument that the ADA is meant to provide greater protection for disabled individuals than is available under § 504, and therefore the ADA must be interpreted more broadly. As further explained by the court:

> In applying a bad faith/gross misjudgment standard to § 504, the Monahan court reasoned that such a standard harmonizes the Education for All Handicapped Children Act of 1975 (a predecessor to the EHA and the IDEA) and § 504 by balancing "the rights of handicapped children, the responsibilities of state educational officials, and the competence of courts to make judgments in technical fields." 687 F.2d at 1171. The Monahan court gave deference to experts dealing with the special needs of disabled children, reasoning that § 504 was not intended to create general tort liability for educational malpractice. *This deference, and the reasoning behind it, is as appropriate under the ADA as it is under § 504.* Therefore, *we hold that in the context of educational services for disabled children, a showing of gross misjudgment or bad faith on the part of school officials is necessary to succeed on an ADA claim.* The Hoekstras have not made such a showing, and therefore their ADA claim must fail.

Id. (emphasis added). See also Fort Zumwalt Sch. Dist. v. Missouri State Bd. of Educ., 865 F. Supp. 604, 607 & n.3 (E.D. Mo. 1994) (dismissing a § 1983 claim alleging violations of the ADA and § 504 in part because "the parents have failed to allege 'bad faith or gross negligence,' which is required to

substantiate a § 504 claim in the context of education," and concluding "the same analysis applies ... under the ADA"); <u>Brantley v. Indep. Sch. Dist. No. 625</u>, 936 F.Supp. 649, 654 (D. Minn. 1996) (agreeing with the district court opinion in <u>Hoekstra</u> and applying the <u>Monahan</u> standard to the ADA).

First, in the matter under consideration, as required by Title II of the ADA, Plaintiffs have not alleged bad faith or gross negligence on the part of the District. <u>See</u> <u>Hoekstra</u>, 103 F.3d at 626; <u>Monahan</u>, 687 F.3d at 170-71; <u>Gorman</u>, 152 F.3d at 912. Moreover, the court has found above that the District met its responsibility under the IDEA, including providing J.L. with a FAPE while he was enrolled in the District. The court finds, therefore, to the extent Plaintiffs allege violations of the ADA in Counts III and IV, that there are no genuine issues of material fact in regard to the ADA claims of Counts III and IV; that the District's Motion for Summary Judgment as to the ADA claims of Counts III and IV should be granted; and that Plaintiffs' Motion for Summary Judgment as to the ADA allegations of the Amended Complaint should be denied. <u>See</u> Fed. R. Civ. P. 56(c); <u>Celotex</u>, 477 U.S. at 322; <u>Hoekstra</u>, 103 F.3d at 626; <u>Monahan</u>, 687 F.3d at 170-71; <u>Gorman</u>, 152 F.3d at 912. As such, the court need not address the District's Motion for Judgment on the Pleadings in regard to the ADA claims of Counts III and IV.

## V.
## CONCLUSION

For the reasons fully articulated above, the court finds, based on a preponderance of the evidence standard and giving due weight to the decision of the Due Process Panel's decision, that the decision of the Due Process Panel should be affirmed. The court also finds that the District is entitled to Judgment on the Record in its favor in regard to Counts I and II of the Amended Complaint; that Summary Judgment should issue in the District's favor in regard to Counts III and IV; and that the Motion for Summary Judgment filed by Plaintiffs should be denied in its entirety.

Accordingly,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by Plaintiffs is **DENIED,** in its entirety; Doc.21

**IT IS FURTHER ORDERED** that the Motion Judgment on the Record as to Counts I and II, Motion for Judgment on the Pleadings, or, in the alternative, for Summary Judgment on Counts III and IV filed by the District is **GRANTED**; Doc.41

**IT IS FURTHER ORDERED** that a Judgment shall issue on this same date incorporating this Memorandum Opinion.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE


Dated this 17th   day of  February, 2010.